No. 82-339

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

RONALD J. KOTAR, BRIAN C. ROAT,
JAMES E. MOORE, II, and TED J. DAY,

Plaintiffs and Respondents,

vs.

TONY ZUPAN and BARBARA THORMAHLEN,
PAULA ROWLEY, et al.,

Defendants and Appellants.

---

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Carbon
Honorable Robert Wilson, Judge presiding.

Counsel of Record:

For Appellants:

Lynaugh, Fitzgerald & Hingle, Billings, Montana
William P. Fitzgerald argued, Billings, Montana
Alan Chase, County Attorney, Red Lodge, Montana

For Respondents:

Ayers and Alterowitz, Red Lodge, Montana
Arthur W. Ayers, Jr. argued, Red Lodge, Montana

---

Submitted: November 17, 1982

Decided: February 10, 1983

Filed: FEB 10 1983

Ethel M. Harrison
_____
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

This action arose on August 5, 1982, when plaintiffs, who are public officials of the City of Red Lodge, filed an action to enjoin defendants Tony F. Zupan, Clerk and Recorder of Carbon County, and Barbara Thormahlen, Election Administrator of Carbon County, from holding a recall election. Sixteen electors of the city of Red Lodge were allowed to intervene as defendants. A hearing was held on August 25, 1982, and the District Court entered an order on August 27, 1982, permanently enjoining the recall elections. The intervening defendant-electors appeal.

We affirm.

In the summer of 1981, the garbage contractor for the City of Red Lodge began calling the city council's attention to violations of the city garbage ordinance by a large grocery store, Beartooth Food Farm. The violations made it difficult to pick up Food Farm's garbage, and eventually the contractor refused to make further pickups from the store.

In October, 1981, the city council contracted with James Coutts to haul Food Farm's garbage. Coutts continued to haul the garbage three times a week until February 1981. The city council knew at all times that Coutts did not have a proper license. Coutts had suggested that the city council hire him, which would legitimize his status by making him a city employee. This proposal was not accepted by the city.

A portion of the public, which was familiar with the license requirement, became upset with the council regarding the hiring of Coutts. Eventually, Food Farm began hauling its own garbage in order to avoid further bad publicity.

Four separate recall petitions were circulated against the officials deemed most responsible for the policy, that

being Mayor Ronald Kotar and Aldermen Brian Roat, James Moore, and Ted Day.

Following are the issues which dispose of this case:

1. Sufficiency of the signature verification procedure used on all recall petitions.

2. Absence of statutory headings from some of the circulation sheets in the Mayor Kotar attempted recall.

3. Percentage of signatures required in each of the aldermen's districts.

With regard to the first issue, the same method of signature verification was used by the election administrator on all recall petitions. All of the recall petitions were delivered to the election administrator in July, 1982. Initially the administrator compared petition signatures on a random basis, under which only a portion of the signatures contained on each sheet were actually compared to the registration signatures. The election administrator certified the recall petitions on July 19, 1982. The administrator did not compare each signature with the registration signature on file until August 24, 1982. This procedure does not meet the plain requirements of section 2-16-620(1), MCA, which provides in part:

> "The county clerk in each county in which such a petition is signed shall compare the signatures of the electors in such county with registration signatures on file in such clerk's office and, if satisfied the signatures are genuine, certify that fact to the officer with whom the recall petition is to be filed . . ."

In State ex rel. Palmer v. Hart (1982), ____Mont.____, ____P.2d____, 39 St.Rep. 2277, this Court held that random verification of signatures was not sufficient and in holding that the comparison must be made in accordance with the statute stated:

3

"Here, the plain and unambiguous language of the statute requires the signatures on the petitions to be compared with the signatures on the voter registration cards. Cf., Jaffe v. Allen (1978), 87 Mich. App. 281, 274 N.W.2d 38, 40; Cirac v. Lander County (1979), 95 Nev. 723, 602 P.2d 1012, 1016; Cloud v. Dyess [(La. App. 1965), 172 So.2d 528]. While it might be to appellants' advantage to allow the clerk's office the discretion to utilize the less arduous signature comparison procedure provided by statute for use in other petition processes, this Court may not do so. We must presume that the legislative body, in this case the voters of the state, knew what it was doing. Dept. of Revenue v. Burlington Northern, Inc. (1976),169 Mont. 202, 211, 545 P.2d 1083, 1088. The District Court was correct in holding the signature comparison process here was in substantial variance with the statutory requirements and was therefore fatal to the recall petition." _Palmer_ , _____ P.2d at _____ , 39 St.Rep. at 2281.

While the petitions eventually were verified by comparing each signature with the registration signature, that was not accomplished within 15 days of submission. More than 35 days passed before verification was completed. This was fatal to all four recall petitions. _Palmer_,_____P.2d at_____, 39 St.Rep. at 2282.

Next we consider the issue of the absence of headings on a portion of the circulation sheets in the mayor's recall petitions. A number of circulation sheets contained signatures which were stapled to the initial sheet containing the heading and reasons for recall. If those signatures are eliminated, there are not sufficient signatures to constitute the 20 percent of electors signatures needed under the Montana Recall Act.

The form of recall petition required under section 2-16-616, MCA, is as follows in pertinent part:

"Form of recall petition. (1) The form of the recall petition shall be substantially as follows:

WARNING

"A person who knowingly signs a name other than his own to this petition or who signs his name more than once upon a petition to recall the same officer at one election or who is not, at the time

he signs this petition, a qualified elector of the state of Montana entitled to vote for the successor of the elected officer to be recalled or the successor or successors of the officer or officers who have the authority to appoint a person to the position held by the appointed officer to be recalled is punishable by a fine of no more than $500 or imprisonment in the county jail for a term not to exceed 6 months, or both, or imprisonment in the state prison for a term not to exceed 10 years, or both.

RECALL PETITION

". . . By his signature each signer certifies: I have personally signed this petition; I am a qualified elector of the state of Montana and (name of appropriate political subdivision); and my residence and post-office address are correctly written after my name to the best of my knowledge and belief.

"(2). . . Each separate sheet of the petition shall contain the heading and reasons for the proposed recall as prescribed above." (underscoring added)

The argument is made that the form is not mandatory and that under section 2-16-618, MCA, " . . . if substantially followed, the petition shall be sufficient, notwithstanding clerical and merely technical errors." We are therefore required to determine if these are clerical and merely technical errors only.

As quoted, the statute is very clear in providing that each sheet shall contain the heading and reasons for the recall. As the warning is read, it becomes apparent why that warning should be on each signature sheet. The warning advises proposed signers that if the signer is not a qualified elector, entitled to vote for the elected officer to be recalled, the signing of the petition is punishable by a fine of not more than $500, imprisonment in the county jail not to exceed 6 months, or both, or imprisonment in the state prison for a term not to exceed ten years. In view of the provisions, the requirement that the warning be on each signature sheet makes reasonable sense. In addition, in the following statement, the signer certifies that he is a

qualified elector in the particular political subdivision and that his residence and post office address are correctly written. Taken together, there is a clear requirement for the inclusion of the warning and statement on each signature sheet. We therefore conclude that the omission of these matters constitutes more than clerical or technical errors. We agree with the District Court that the sheets which did not contain the required headings and reasons for recall cannot be considered, with the result that there are insufficient signatures for Mayor Kotar's recall election.

With regard to the percentage of electors required for the individual aldermen, there were 1,218 registered electors for the city of Red Lodge qualified to vote at the November 1981 municipal election. Section 2-16-614, MCA, provides:

> "Recall petitions for elected or appointed officers of municipalities or school districts shall contain the signatures of qualified electors equalling at least 20% of the number of persons registered to vote at the preceding election for the municipality or school district."

Twenty percent of the registered voters of Red Lodge equals 244. The petitions asking the recall of Aldermen Roat, Moore and Day contained verified signatures of 101, 121 and 100. While these signatures exceeded 20% of the voters in the district of each alderman, they were less than the 20% of the registered voters for the city of Red Lodge.

The District Court held that there were an insufficient number of signatures on each alderman's petition in that a number equal to 20% of the electors of the entire municipality must sign the petitions. We disagree.

Section 2-16-612(3) provides:

> "Every person who is a qualified elector of a political subdivision of this state may sign a petition for recall of an officer of that political subdivision. However, if a political subdivision is divided into election districts, a person must be a qualified elector in the election district to

6

be eligible to sign a petition to recall an officer
elected from that election district."

Only those Red Lodge electors living in each alderman's district are eligible to sign a petition to recall that alderman. Construing sections 2-16-612(3) and 2-16-614, MCA, together shows that only 20% of the qualified electors of an alderman's district need sign a recall petition.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

Mr. Justice John C. Sheehy, dissenting:

I dissent. I will file later my reasons for dissent.

_____
Justice

7

Mr. Justice John C. Sheehy, concurring in part and dissenting in part:

I concur with the majority where it holds that there was a sufficient number of signatures for each of the officers involved in the recall effort. I dissent with all possible vigor to the remainder of the majority opinion.

The decision in this case is a giant step backwards for the people of Montana. Its immediate effect is to blunt, nay, negate the efforts of a substantial number of residents in Red Lodge to have a say about their elected officers through recall. But its longlasting effect is to give opponents of recall tools to defeat the recall process. As a court, we should not be thwarting recall efforts. All governments, Jefferson said in a famous document, derive their just powers from the consent of the governed. This Court has needlessly prevented those citizens of Red Lodge from expressing their dissent--their lack of consent to be so governed. There is little to be proud of in that result.

Elected officials regard recall as a tramp in the parlor. For that reason efforts to have a recall act enacted in the legislature fell short in several sessions. Frustrated in the legislative process, the believers in recall fostered the "Montana Recall Act" by the initiative process in 1976 as a way to bypass a negative legislature. Put to the people for their vote, the Montana Recall Act passed 155,899 for to 115,702 against. At last, the believers exulted, power to the people had been achieved.

The legislature got its hands on the Recall Act in its 1977 session. By way of "cleaning up the act" they inserted several new provisions. One was the "warning" provision relied on here by the majority. Another was the requirement

that "each separate sheet of the petition" should contain the warning and reasons for recall. Only incidentally the legislature increased the number of signers to petition for the recall of legislators from 10 percent to 15 percent of the eligible voters.

The legislators, however, did not remove section 2-16-618, MCA, (it was probably overlooked by them) as follows:

> "2-16-618. Forms not mandatory. The forms prescribed in this part are not mandatory, and if substantially followed, the petition shall be sufficient, notwithstanding clerical and merely technical errors."

Section 2-16-618 was in the original initiative. It is a mandate to us, in construing the act, to uphold petitions if they substantially follow the act. The majority here, enjoined not to be technical, have skated around this section on a cold technicality of reasoning, finding "reasonable sense" in a warning on each sheet. Forgotten by the majority, but showing the technicality of the technique of insisting on a warning on each page, is another provision in the Recall Act that the petition may be a continuous sheet, folded to the dimensions of 8 1/2 x 14 inches. Thus a continuous sheet, folded like a computer printout, would pass muster under the act, even though the warning appeared only at the beginning, so long as the folds did not exceed 25 pages. Section 2-16-617(1), (2), MCA.

I see extreme technicality in requiring the warning to be on each successive sheet of a stapled petition, when a continuous sheet, folded as a printout form of several pages is valid under the act. I do not agree that this Court should join with the legislature in thwarting the obvious purpose of recall and thus prevent electors from getting to

9

the meat of the issue, whether the electors consent to X remaining in office.

The other reason relied on by the majority to defeat the recall in this case is that the county clerk did not properly verify the signers of the petition. Again the reasoning of the majority is most technical. All that the statute requires is that the county clerk be "satisfied [that] the signatures are genuine" and on that satisfaction certify his determination so that the election may be held. Section 2-16-620, MCA. Thus the majority makes it possible for a recall effort to be blocked merely by the inaction of a county officer over whom the signers of the recall petition have no control. Under the holding of the majority, a recalcitrant, obstreperous or just plain negligent county clerk can frustrate the recall process.

As I said, the majority has given elected officials two powerful tools to obstruct the recall process, technical interpretation, and official inaction. After all these years of effort, supporters of the recall process are back nearly where they started.

_John C. Sheehy_
Justice